Shaokelfobd, J.,
delivered tlie opinion of the Court.
On the 1st of August, 1866, the plaintiff in error filed his petition in the Circuit Court of Rutherford, for a mandamus against the defendant, as a Register of voters, appointed under the provisions of the Act of May 3, 1866, passed by the General Assembly of the State, determining the qualification of voters and limiting the elective franchise. The petitioner avers that he is fifty years of age; has been a citizen and resident of that county for more than twenty years; that he is a free white man; that on the 26th of July, 1865, he was pardoned by the President of the United States, for all offenses committed against the Government of the United States and State of Tennessee, and has committed no offense against either, since his pardon, and has, in all respects, conducted himself as a loyal citizen; and that he has been accustomed to exercise the right and privilege of voting at all elections in said county, as guaranteed to him under the Constitution of the State of Tennessee, and which right and privilege he has never forfeited; that the defendant is exercising the right to register votes in said county under .the provisions of the Act referred to, and giving certificates; that on the 1st day of August, 1866, not recognizing the validity of said franchise Act, (except so far as it authorizes a Register of voters and certificate in accordance with the Act requiring registration,) he applied to said defendant, at his office in the town of Murfreesboro’, to register his vote, and give him a certificate as a qual *572 ified voter of the county. He offered to produce his pardon, but was informed he would not register his vote unless he brought himself within the provisions of the Act of May 3d, 1866. He prayed a mandamus nisi issue against the defendant, that he appear and show cause why a peremptory mandamus should not issue; and that by judgment of the Court, the defendant, Sherbrook, be compelled to register him as a qualified voter, and issue him a certificate.
A mandamus nisi was issued by the Hon. Henry Cooper, one of the Circuit Judges, which was duly executed on the defendant, at the same term. The defendant in error appeared and filed his answer; admits the plaintiff in error had, for many years prior to the late rebellion, resided in the county of Rutherford; and had, up to that time, exercised all the privileges of a citizen of the State of Tennessee; that the plaintiff in error, since the surrender of the Confederate forces, has continued to reside in the county; that he has had his pardon from the President of the United States; that he, the defendant, is the Register of voters in said county, under the provisions of the law referred to; that the plaintiff in error applied to him to register his vote and give him a certificate, but would not comply with the provisions of the law of May 3d, 1866, as to entitle him to a certificate and registration.
The cause came on to be heard by the Hon. Henry Cooper, who being of the opinion that the defendant in error was not a legal and constitutional officer of the State of Tennessee, which he assumed to *573 hold, it being created by a body calling itself the Legislature of Tennessee, when by law said body ceased to exist; and therefore the officer created by them was no officer; and the appointment of the defendant in error was null and void, and dismissed the petition; from which the relator appealed to this Court.
These facts involve the consideration of the constitutional validity of the Acts of the G-eneral Assembly, respectively, passed on the 5th of June, 1865, and the 3d of May, 1866.
The questions raised are of the greatest consequence; and they have been discussed with great zeal and ability on both sides. With the consequences that may follow from any decision we may make, as well as the wisdom and policy of the laws, we have nothing to do. We cannot enact laws, or change their results for good or for evil upon society. Our duty is to declare and enforce them as we find them written, and test their validity by the Constitution.
Eor the proper understanding of the questions involved, it becomes necessary to look to the situation and condition of the country at the time the Constitutional Amendments and Schedule, under which these laws were passed, were submitted to the people, and the causes that led to their adoption.
In 1861, a large portion of the people of Tennessee, and other Southern States of the Union, attempted, by an armed rebellion, to throw off their allegiance to the G-overnment of' the United States, and to erect within the territory, a separate and independent government; and war followed, which continued until 1865. During its progress, the Governor, and many of the of *574 ficers of the State, fled, carrying with them the archives and treasures of the State. Most of the Courts of justice were closed. The people of the State were without an organized State Government. A dismal anarchy overspread the land. Roving hands of banditti plundered the citizens with impunity. They were without protection of law, and there was no security for life or property. Fear had seized upon the hearts of the people. The land was drenched in blood, and anarchy reigned supreme.
While yet the smoke of battle lingered around, the loyal people of the State assembled in convention at the Capitol of the State, for the purpose of reorganizing the State Government under the authority of the Government of the United States, and to place the State in her ancient moorings, from which she had been so violently driven by the act of a portion of her people, and to restore the supremacy of the law, bringing order out of chaos, and thus secure to the people peace, safety and happiness. The convention recognized, to the fullest extent, the principle that all power is inherent in the people, and all free governments are founded on that authority, and instituted for their peace, safety and happiness. For the advancement of these ends, they have, at all times, an unalterable and indefeasible right to alter, reform or abolish the government, in such man-nor as they may think proper. The principles in this country are well recognized political truths, independent of any written constitution or laws.
The convention thus assembled proposed to the people, for their ratification or rejection, certain amendments to the Constitution of the State, with a Schedule *575 thereto annexed — all of which were ratified by the people at the ballot-box; whereby, upon the proclamation of Andrew Johnson, then Military Governor of the State, by the authority of the President of the United States, the said Amendment and Schedule were declared to have been adopted by the people of the State; and said Amendment became a part of the Constitution, and the provisions of said Schedule, for all the purposes for which they were designed, and had all the force of constitutional provisions.
By the 9th section of the Schedule, it is provided the qualifications of voters, and the limitation of the elective franchise, may be determined by the General Assembly which shall first assemble under the amended Constitution.
By this provision of the Schedule, the sovereign people conferred upon the General Assembly designated, the same absolute, unlimited and sovereign power to determine the qualification of voters, and the right to limit the elective franchise, which the members possessed in their sovereign capacity.
Under this provision of the Schedule, the Acts of June 5th, 1865, and May 3, 1866, determining the qualification of voters, and limiting the elective franchise, was passed. Both these acts impose great restrictions and limitations on the right of voting, which did not exist under the Constitution of 1834, Article 4, Sec. 1.
We are, at this advanced term, amidst the varied and complicated duties that have been imposed upon us during the session, unable to do more, at present, *576 than to announce the result of our decision. The elective franchise is not an inalienable right or privilege, but a political right, conferred, limited, or withheld, at the pleasure of the people, acting in their sovereign capacity. Each State may define it in its own Constitution, or empower its Legislature to do so.
The right once granted, may be taken away by the exercise of sovereign power, or forfeited for crime, under the laws of the State; and if taken away by the sovereign power of the State, (as by an alteration in its Constitution,) no vested right is violated, or bill of attainder passed, or Act of pains and penalties, in the sense of the Constitution of the United States. It follows, if the Convention of 1865, could, under the ratification of the people, declare the qualification of voters and limit the elective franchise, it could delegate the power to the Legislature.
It might have left the elective franchise open to the action of all future legislation; but it chose to limit it to the General Assembly which should first assemble under the Constitution; and, is, therefore, binding on the people of the State.
The relator was pardoned by the President of the United States, the effect of which, was to restore him to the rights and privileges of a citizen of the United States; but it did not have the effect, without the assent of the State, where the sovereign power had excluded him from political rights, to restore him to the exercise of those rights.
Women and minors are citizens; yet, by the Constitution, they are prohibited from the exercise of po *577 litical rights: 4 Dev. 20. Ho one has ever doubted the proposition, that, according to the institutions of this country, the sovereignty of a State exists with the people of the State, and that they may change, alter, abolish, or reform their government at pleasure: Luther vs. Borden, 7 Howard, 1. This being so, it follows that they had a right to determine who should exercise the right of suffrage.
We have examined the late cases, decided by the Supreme Court of the United States, in which the validity of a section of the Constitution of Missouri, came under review before that Court, requiring every attorney, minister of the gospel, schoolmaster, trustees of charitable institutions, etc., to take an oath restrictive in its character, before he could exercise the privileges of his calling. The Court held, as well as we can understand from the newspaper report of the case, that where a citizen has an office, employment, or calling, a State cannot, directly or indirectly, declare a forfeiture of the office or calling pursued by the citizen as a means of living, by the imposition of an oath which the party cannot take. A citizen has the right to labor with his hands, or intellectually.
These are civil rights, and inalienable, and of which he cannot be deprived by the people of the State. But a political right stands upon a very different principle; it is a political privilege or grant, that may be extended or recalled, at the will of the sovereign power. It follows, therefore, though the relator was pardoned by the President of the United States, and *578 he was restored to his privileges as such; and though he had the right to vote, under the Constitution of' 1834, the Legislature having, under the powers delegated to them, changed article 4, section 1, of the Constitution, he could not claim the right to register as a voter, unless he brought himself within the provisions of the Act of May 3, 1866. We think the Act is binding and valid, and the law of the State. The relator not having complied with the provisions of the law, is not entitled to relief.
His Honor, the Circuit Judge, held, the Legislature that passed the law, was an illegal body, having no authority to pass the Act of registration. There is nothing in this record affecting the validity of the law; it is signed by the Speakers of both Houses, under the provisions of the Constitution, and is, so far as this record presents the facts, a valid law. The point was abandoned in argument by the counsel of the relator, and is wholly untenable.
The petition will be dismissed.